LASBY ET AL., RESPONDENTS, *v.* BURGESS, APPELLANT.

(No. 6,589.)

(Submitted March 5, 1930. Decided March 25, 1930. Opinion on Motion for Rehearing Filed July 16, 1930.)

[289 Pac. 1028.]

*Mr. E. H. Goodman* and *Mr. Henry C. Smith,* for Appellant, submitted an original and a reply brief; *Mr. Smith* argued the cause orally.

*Mr. J. R. Wine, Mr. Wm. Scallon* and *Mr. Frank T. Hooks,* for Respondents, submitted an original and a supplemental brief; *Mr. Hooks* argued the cause orally.

*Mr. William T. Pigott,* of Counsel for Respondents on Motion for Rehearing.

HONORABLE BENJAMIN E. BERG, District Judge, sitting in place of MR. JUSTICE MATTHEWS, disqualified, delivered the opinion of the court.

This is a suit in equity to rescind and set aside a contract for the sale of real property, and a deed and purchase price mortgage executed as a sequel to said contract, on the ground of fraud. This·is the second time this case has been before this court. (See *Lasby* v. *Burgess,* 76 Mont. 452, 248 Pac. 190.)

The original complaint was filed January 16, 1924. The amended complaint was filed November 22, 1926, which, in substance, sets forth that on the eighteenth day of August, .1919, the defendant, by contract in writing, agreed to sell and the plaintiffs agreed to buy the southwest quarter of section 16 and lot 8 of section 17, township 6 north, range 2 east, in Broadwater county, Montana, containing 200 acres; also the south half of the northeast quarter of section 17, township 6 north, range 2 east, for the sum of $30,000, of which $1,000 was paid at the time of executing the contract, $9,000 to be paid March 1, 1920, and the remainder to be paid on or before five years from March 1, 1930, secured by a mortgage upon said real estate; that, during the negotiations leading up to the execution of the contract, the defendant fraudulently represented to the plaintiffs that the tract of land contained 280 acres; that the tillable portion of the lands and the wild hay land in different fields totaled 199 acres; that no part of the land was covered by the Missouri River which formed the southwest boundary of a portion of the lands; that said representations were false and were known to the defendant to be false at the time he made them, were material, were

made by the defendant with the intention that the plaintiffs should act upon them; that the plaintiffs believed the representations to be true and, so believing, acted upon them to their damage; that they did not discover the truth until the latter part of November, 1923, and did not become fully informed as to the true condition of the lands until January, 1924.

They further alleged that the Northern Pacific Railway runs across the land, and at all times the width of the right of way fenced through the land was 75 to 100 feet but that in truth the right of way was 400 feet in width, which was unknown to the plaintiffs; that the land in the right of way and not fenced was 30.86 acres; that the defendant represented he owned the land up to the fence of the right of way; that in truth there were only 138.2 acres of tillable land and 17.8 acres of wild hay land; that by the terms of the contract defendant agreed to furnish the plaintiffs with an abstract of title to the land and, prior to February 28, 1920, the defendant did furnish the plaintiffs with an abstract of title to the land, which disclosed that lot 8 of section 17 contained 30.86 acres of land and made no reference to the right of way of the Northern Pacific Railway Company through the land; that pursuant to the contract and on February 28, 1920, the plaintiffs paid the defendant $9,000, $8,000 thereof in cash and $1,000 by conveying to defendant certain lots in Townsend, and executed to the defendant their note for $20,000, secured by a mortgage on the land; that both the plaintiffs were interested as purchasers of the land, and both advanced money toward the payment of the purchase price; that the plaintiffs have offered to convey the lands back to the defendant and restore to the defendant all that they received from him, and in turn they have demanded that the defendant return to the plaintiffs the amount of money paid to him on the purchase price, and interest, and that the defendant reconvey to the plaintiffs the lots in Townsend.

The defendant's answer admits the execution of the contract, deeds, mortgage and the plaintiffs' offer to rescind, and in

other respects is a general denial of the complaint, and sets up five affirmative defenses:

First: That from August, 1919, to February 28, 1920, plaintiffs knew or, in the exercise of ordinary care, should have known of the alleged defects in the land; that they relied on their own inspection of the land and not on the defendant's representations, and are now estopped from claiming any defects in the land.

Second: That plaintiffs are estopped for the reason that for more than four years prior to the commencement of this action plaintiffs were in possession and control of the lands, and have had every means at their command to discover the defects complained of, and have delayed the assertion of any defects in the land for an unreasonable length of time and until the market value of the lands has substantially depreciated and until the defendant cannot be made whole.

Third: That on the first trial of this action substantially the same issues were presented and were decided by Judge Law, who tried the case, against the plaintiffs, and plaintiffs are estopped to again demand the trial of such issues.

Fourth: The fourth affirmative defense has been abandoned.

Fifth: That the plaintiffs' alleged cause of action is barred by section 9027 and paragraph 4 of section 9033, Revisel Codes of Montana, 1921.

The reply puts in issue all of the affirmative defenses.

The trial court made all findings of fact and conclusions of law in favor of the plaintiffs; judgment was entered in favor of the plaintiffs, effecting a complete rescission of the entire transaction. The defendant appeals from the judgment.

We think the evidence fairly establishes the following facts: That the defendant represented to the plaintiffs that the land in question contained 280 acres and a price of $30,000 for the entire farm was agreed upon; that on August 14, 1919, William D. Lasby, one of the plaintiffs, and one John A. Klein, a witness for the plaintiffs, visited the land and, in company with the defendant, examined the entire property, and at this time the defendant told William D. Lasby, in response to

questions, the areas of the various fields, saying that he never had the fields surveyed and that the areas of the various fields were estimates derived from drill measurements; the areas of the various fields totaled 170 acres of tillable land; that the defendant told the plaintiff he estimated there were about 29 acres of wild hay land; that defendant gave plaintiffs to understand that his west line was about a rod from the river. At the time of the United States survey of the land, as shown by the maps in evidence, lot 8 of section 17, which, if not designated as a lot, would be the northeast quarter of the southeast quarter of section 17, according to such survey, contained 30.86 acres. The west line of said lot, which would be an extension south of the west line of the northeast quarter of the northeast quarter of section 17, extended from the south line of the north half of the northeast quarter of section 17, a distance of about 900 feet to the bank of the Missouri River, and thence in a curve arching northeast, southeasterly to a point about 300 feet from the west line of the southwest quarter of section 16; that between the time of the making of the aforesaid survey and the fourteenth day of August, 1919, the river had washed the greater portion of lot 8 away, extending its north bank in the form of an arch into lot 8 and washing away a portion of the south half of the northeast quarter of section 17 at a point directly north of lot 8; that on the fourteenth day of August, 1919, the plaintiff William D. Lasby visited this portion of the lands and observed that a part of the fence marking the boundary of the south half of the northeast quarter of section 17 had been washed away; that in November, 1923 only nine or ten acres of land remained in lot 8, assuming the survey made by the witness Charles W. Helmick to be correct; that prior to February 28, 1920, the defendant furnished the plaintiffs with an abstract of title and on the first page thereof was a plat showing lot 8 of section 17 as it was when surveyed by the United States government, showing the course of rivers and showing the area to be 30.86 acres.

That the right of way of the Northern Pacific Railway runs across the land entering the southwest quarter of section 16 at an angle of approximately north 25 degrees west, through the whole of the last-mentioned quarter-section and across the northeast corner of the north half of the northeast quarter of section 17, and the right of way is fenced, varying in places as to width, but generally fifty feet on each side of the center line; that the full width of the Northern Pacific right of way is 400 feet · through the land. The plaintiff William D. Lasby, while inspecting the lands, saw the railroad running through the farm and observed the right of way as fenced. The defendant made no representations as to the width of the right of way of the Northern Pacific Railway Company to either of the plaintiffs, except stating that he farmed the lands in certain places up to the right of way fence. The railway right of way at 400 feet width contained 35.5 acres of land, the actual shortage in lot 8 washed away by the river was 21.36 acres and an additional shortage of 1.34 acres in the entire tract, making a total shortage of 58.2 acres. There were 138.2 acres of cultivated land, a small part of this being within the 400-foot right of way, and there were 17.8 acres of wild hay land. Plaintiffs rented the land to one Danzer in the fall of 1919, and on or about February · 28, 1920, complied with the terms of the contract and paid to the defendant $8,000 in money, and conveyed to the defendant, in lieu of $1,000, three lots in the town of Townsend, Broadwater county, Montana, and executed to the defendant their promissory note for $20,000 due five years after March 1, 1920, and executed a mortgage upon the premises to secure the payment of the note. The tenant farmed the lands for the years 1920 and 1921. The plaintiffs, with hired help, farmed the lands in 1922 and 1923, and retained possession of the lands until January, 1924. During this period plaintiffs paid interest on the mortgage indebtedness, and the last payment of interest of $400 was made October 15, 1923. The representations and statements made by the defendant Burgess to

William D. Lasby were by him communicated to his wife, co-plaintiff.

There are forty-two assignments of error, but, from the view we take of the case, it will be necessary to consider only whether or not the evidence discloses that the plaintiffs are estopped by reason of their laches, and whether the plaintiffs' cause of action is barred by the statute of limitations.

In finding No. 23, the trial court found as follows: "The plaintiffs did not discover and did not become informed in any manner of the defects in the quantity or area of land sold to them by the defendant as above mentioned until the latter part of November, 1923, and that the plaintiffs did with all due diligence upon discovery by them of such material shortage proceed to the commencement of this suit praying for the rescission of the contract entered into above mentioned, and with all due diligence and proper dispatch prosecute this action, and the court does specifically find that the statute of limitations had in no manner tolled nor does it in any manner bar their right to prosecute this action."

And the court made the following conclusions of law, based on finding No. 23, namely:

"Conclusion of Law No. 3: That the plaintiffs were not guilty of laches, either in the commencement of their suit, or in the prosecution thereof, and that the plaintiffs' right of action set forth in the pleadings herein against the defendant is not barred by laches.

"Conclusion of Law No. 4: That the plaintiffs' action was instituted in good time and is not barred by the statute of limitations."

The plaintiffs in this court for the first time raise an ▆ objection to the amendment of the defendant's answer allowing the fifth affirmative defense to be added to the answer, on the ground that the amendment came after the evidence had been introduced and it was then too late. The record shows that the order permitting the amendment was made by motion of the defendant to conform to the proof, and the amendment was made without objection on the part

of the plaintiffs; that the plaintiffs thereafter replied to the amendment and requested findings of the court on the issue tendered by such amendment and the reply thereto, and that the court did find in favor of the plaintiffs and against the defendant on the issue presented. No objection having been made to the allowance of the amendment in the lower court, the question is not presented for review by this court.

Plaintiff William D. Lasby. testified that the first he knew ▇ of any shortage in the acreage of the farm was on the second Sunday of September, 1923, when his hired man, Mr. Bradshaw, told him that the various fields were short, and that he thereafter secured the services of Charles W. Helmick, a surveyor, to survey the land, and that it was only upon the completion of this survey that he acquired actual knowledge of the shortage, which was made in November, 1923.

Sidney Plunkett, a witness for the defendant who had worked on the ranch for several years for Mr. Burgess, testified that in September, 1919, he told the plaintiff the correct acreage in each of the various fields, and Chris Miller, a witness called by both the plaintiffs and the defendant, and who had also worked on the ranch for Mr. Burgess, testified that he told the plaintiff William D. Lasby the correct acreage of two of the fields either in the spring of 1920 or the spring of 1922. The questions and answers propounded may be of interest. Question directed to the witness Chris Miller:

"Q. I will get you to state whether or not on or about the first of April, 1922, in the Lasby store, you and Lasby being present and no one else, you told Mr. Lasby that in the large piece of cultivated land next to the house there was 33 acres and 22 acres in the piece adjoining? A. I believe I did.

"Q. In what year was that? A. I think in 1920. In the spring of 1920."

On cross-examination:

"Q. And not in 1922, you think? A. I don't know. It was during the time Mr. Lasby was operating the ranch out there."

Mr. Lasby was interrogated about this conversation, and the following are the questions and answers directed to him:

"Q. Do you know Chris Miller? A. Yes sir.

"Q. Is it not a fact that at your store on or about the year 1920, in talking about this same piece of land, he told you there was 33 acres of alfalfa and 22 acres in the piece of land adjoining? A. We talked a good many times.

"Q. You told us before you did not remember any such conversation and that is what you say now? A. Yes. He may and may not have told me that, but I did not pay any attention.

"Q. If he did tell you that in 1920 you did not pay any attention to what he told you? A. No sir. I passed it as an incident."

When questioned concerning the conversation testified to by the witness Sidney Plunkett, the following questions and answers are illuminating:

"Q. Recalling to your memory the name of Syd Plunkett, what is Mr. Plunkett's business, do you know? A. No, I don't.

"Q. How long have you known him? A. I don't know, maybe seven, eight, or ten years.

"Q. You know him by sight, don't you? A. Yes, it might be twelve years. He used to work for Burgess.

"Q. That is the gentleman I mean. A. Yes, I know him.

"Q. And you don't know what his business is? A. He works on ranches around here, and at present I think he is working at the hotel.

"Q. Calling your attention to the month of September, 1919, about Fair time, is it not a fact that Mr. Plunkett told you in a conversation in or near your drug store, how much acreage there was in one of these cultivated pieces on the Burgess place? A. No, I don't remember any conversation with him at all.

"Q. Will you state he did not? A. I wouldn't say.

"Q. If he did, would you pass it off the same as the Miller matter? A. I relied upon Burgess. He was a responsible man.

"Q. Mr. Plunkett may have told that to you? A. I don't know. I couldn't tell.

"Q. Weren't you trying to rent the place to Plunkett that fall? A. No, I don't remember whether I did or not. I rented it to Danzer about that time.

"Q. You don't remember whether you had any negotiations with Mr. Plunkett? A. No, I don't. I tried to get him to work on the ranch.

"Q. You knew he had been working on the Burgess ranch? A. Yes.

"Q. With your knowledge of the fact that he had worked on the Burgess ranch, is it not a fact that at that time and place he told you how much acreage there was in each one of these cultivated pieces, the hay land and grain land? A. If he did I don't remember anything about it. I won't say he did or did not, because I didn't pay any attention. He was not reliable, as far as I was concerned. I had confidence in Mr. Burgess and he represented to me he had certain stuff and I paid attention to him."

The witness Sam Stennett testified that in October, 1921, the plaintiff William D. Lasby spoke to him about building some kind of a breakwater to sheer off the water from cutting away his land, and asked the witness to look at it and see what it would cost.

The witness Noah Davis testified that on or about the last of February or the first of March, 1922, the plaintiff William D. Lasby told the witness that he was going to build a dam to keep the Missouri River from cutting into the land, and he was going to get Sam Stennett to do the work.

The plaintiff William D. Lasby, when asked about these two conversations, on cross-examination, gave the same kind of answers as he did when asked concerning the conversations with Sidney Plunkett and Chris Miller, that is, that he did not remember.

"The testimony of a witness is no stronger than elicited ▪ on cross-examination." The testimony of the witnesses Miller, Plunkett, Stennett and Davis was positive and direct as to the conversations with the plaintiff William D. Lasby. The witness Lasby does not deny the conversations. The most that can be said of his testimony is that he does not remember them. The testimony of a witness that he does not remember whether a certain event took place does not contradict in any degree positive testimony that it did occur. (*Idaho Merc. Co.* v. *Kalanquin*, 8 Idaho, 101, 66 Pac. 933; 23 C. J., p. 42; *Herman Lumber Co.* v. *Bjurstrom*, 74 Misc. Rep. 93, 131 N. Y. Supp. 689; *Inman's Admx.* v. *United Rys. Co. of St. Louis*, 157 Mo. App. 171, 137 S. W. 3; *Eckert* v. *Century Fire Ins. Co.*, 147 Iowa, 507, 124 N. W. 170, 171; *Title Guaranty & Surety Co.* v. *Poe*, 138 Md. 446, 114 Atl. 481; *Reid* v. *Holcomb*, 63 Cal. App. 89, 218 Pac. 76; *Railsback* v. *Patton*, 34 Neb. 490, 52 N. W. 277.)

Lasby's statement that he did not remember of the witnesses Plunkett and Miller telling him of the shortage in acreage, adding that they might or might not have done so, in the face of the positive testimony of these witnesses that they did tell him, did not raise a conflict in the evidence on this point. *Eckert* v. *Century Fire Ins. Co.*, supra, presented a parallel situation and we quote the following pertinent discussion from that decision: "Eckert testified that, when Flynn was filling out the application, he asked the question whether the property was incumbered; that he answered that it was; that he did not see the answer that Flynn wrote to the question, or know that he had written a negative answer thereto, until after the fire. Flynn testified but did not deny that Spangler and Eckert had informed him of the mortgage. He did testify, however, that he had no recollection of their so informing him, and that, as far as he could remember, his first knowledge of the mortgage was received through a letter from the president of the company after the loss. We think the testimony of Flynn did not raise a conflict in the evidence on that point. The fact that he did not remember the conversations with

Spangler and Eckert would not necessarily tend to create such conflict. Nor would his further statement that, as far as he could remember, he did not know of the mortgage until after the fire. The latter statement was but a reiteration that he had no recollection of the conversation testified to by Spangler and Eckert, for there was no claim that he had received information as to the mortgage from any other source. So far then as the fact of the notice is concerned, the trial court properly directed a verdict.''

Further weight is added to the Plunkett testimony by Lasby's admission that he did try to get Plunkett to work for him. Lasby's admission is consistent with Plunkett's statement,—''And he wanted me to run the place; he said, 'You know more about the place; you have been on it so long'—he wanted me to take it on part payment, him pay me so much a month and give me part of the crop.''

While it is the established rule in this court not to disturb the findings of the trial court unless the evidence preponderates against them, yet where there is no conflict in the evidence or the evidence preponderates against a finding, the court will not hesitate to set it aside. In the case of *Gray* v. *Grant*, 62 Mont. 452, 206 Pac. 410, 417, Mr. Justice Galen, speaking for the court, used this language: ''However, in a case such as this, where there is little or no conflict in the evidence, which is unsatisfactory in character, and furnishes no substantial basis for the findings of the trial court, this court will not hesitate to finally determine the rights of the parties. If a clear and satisfactory showing is not made in support of the findings, this court will in furtherance of justice, in proper cases, set them aside.'' (*McConnell* v. *Blackley*, 66 Mont. 510, 214 Pac. 64.)

Nor is it material from what source plaintiff gained information of the fraudulent acts of which he complains. If the information was such as to put him on inquiry, which, if pursued, would result in knowledge, it is sufficient, although coming from a third person. (Black on Rescission and Cancellation, 2d ed., sec. 539; *Matteson* v. *Holt*, 45 Vt. 336.) No-

tice of facts and circumstances which would impel a man of ordinary prudence and intelligence to make inquiry is equivalent to knowledge of the facts. (*Lady Washington Consol. Co.* v. *Wood,* 113 Cal. 482, 45 Pac. 809, infra, and other cases cited infra.)

Section 7567, Revised Codes of 1921, provides: "Rescission, when not effected by consent, can be accomplished only by the use on the part of the party rescinding, of reasonable diligence to comply with the following rules: 1. He must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind. * * * "

And section 9027, coupled with section 9033 of the Revised Codes of 1921, provides: "Periods prescribed for the commencement of actions, other than for the recovery of real property, are as follows": Section 9033 enumerates the classes of actions which may be commenced within two years, and subdivision 4 thereof provides: "An action for relief on the ground of fraud or mistake, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake."

The law is well settled that one who seeks to rescind a transaction must act promptly upon discovery of the facts entitling him to rescind. (*Ott* v. *Pace,* 43 Mont. 82, 115 Pac. 37, 39; *Streicher* v. *Murray,* 36 Mont. 45, 92 Pac. 36; *Hillmun* v. *Luzon Cafe Co.,* 49 Mont. 180, 142 Pac. 641; *Hills* v. *Johnson,* 52 Mont. 65, 156 Pac. 122; *Grymes* v. *Sanders,* 93 U. S. 55, 62, 23 L. Ed. 798; *Ruhl* v. *Mott,* 120 Cal. 668, 53 Pac. 304.)

In *Ott* v. *Pace,* supra, the plaintiff sought a rescission of the sale of land on the ground that the defendant had misrepresented the character of the land and its productivity. The plaintiff had held possession of the land for two years, and knew the true character of the land. The court held that this information must have come to him at least at the end

of the first year of his farming operations; that the plaintiff, in not bringing his suit for cancellation of the transaction until more than a year after discovery, was guilty of laches. The court said: "Since fraud in the inducement of a contract does not make it void, but only voidable * * * it was within the power of Ott to rescind or to treat the first contract as valid * * * and his continuing in possession of the property and his payment of the delinquent installment after discovering the fraud amounted to an affirmance of the first contract and constituted a bar to a rescission." The court quoted from the case of *Grymes* v. *Sanders,* supra, as follows: "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted."

In the case of *Smith* v. *Christe,* 60 Mont. 604, 201 Pac. 1011, which was an action to rescind a contract for the purchase of land, the plaintiff bought the land in October, 1917, received a deed for it in March, 1918, and moved on the land. The land was represented as clear and free from fan weed, and on or about April 5, 1918, he discovered the land was infested with fan weed and on July 5, 1918, served notice on the defendant of his rescission of the transaction, tendering the farm back to the defendant and demanding payments made and the cancellation of the purchase-price mortgage. The plaintiff continued thereafter to occupy and till the land until the trial of the action in March, 1919. Under these circumstances, the court held the plaintiff had waived his right to rescind.

In the cases of *Ott* v. *Pace* and *Smith* v. *Christe,* the statute of limitations was not involved, as the two-year period had not expired.

In the case at bar, the fraud, if any, was perpetrated upon the plaintiffs in August, 1919, and the plaintiffs' cause of action then accrued and, unless the facts in the case justify the finding that the plaintiffs, in the exercise of due diligence, did not discover the fraud until within two years prior to the commencement of this action, the plaintiffs' action is barred by the statute of limitations.

In *Kerrigan* v. *O'Meara,* 71 Mont. 1, 227 Pac. 819, 821, our court quoted with approval from *Sublette* v. *Tinney,* 9 Cal. 423, Mr. Justice Field rendering the opinion, the following: ''The cause of action cannot be deemed to accrue upon the discovery of the fraud, in any other sense than that the statute will not be deemed to commence running until such period. Fraud is the substantive cause of action; upon its commission the right of action arises, not upon its discovery.'' And our court, commenting upon this quotation, said: ''And as that great jurist said, the policy of the law is that actions upon the ground of fraud shall be commenced within two years, but, that an innocent party may not suffer whilst in ignorance of his rights, the statute exempts him from the limitation until a discovery of the fraud. This clause of the statute is an exception to the general provision, and, whether it must be pleaded or not, it must be proved. Now the word 'discovery' as used implies that the facts have been concealed from the party relying upon the exception. 'Discovery' and 'knowledge' are not convertible terms, and whether there has been a discovery of the facts constituting the fraud within the meaning of the statute is a question of law to be determined from the facts proved. It is not enough for the plaintiff merely to say that he was ignorant of the facts at the time of their occurrence, and has not come into knowledge of them until within two years. 'He must show that the acts of fraud were committed under such circumstances that he would not be presumed to have knowledge of them, it being the rule that if he has ''notice or information of circumstances which would put him on inquiry which if followed would lead to knowledge,

or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of the facts." ' "

In the case of *Lady Washington Consolidated Co.* v. *Wood*, 113 Cal. 482, 45 Pac. 809, 810, which was an action to rescind a contract, the court, in discussing and defining the meaning of the word "discovery" in relation to such actions, said: " 'Discovery' and 'knowledge' are not convertible terms, and whether there has been a 'discovery' of the facts 'constituting the fraud,' within the meaning of the statute of limitations, is a question of law to be determined by the court from the facts pleaded. As in the case of any other legal conclusion, it is not sufficient to make a mere averment thereof, but the facts from which the conclusion follows must themselves be pleaded. It is not enough that the plaintiff merely avers that he was ignorant of the facts at the time of their occurrence, and has not been informed of them until within the three years. He must show that the acts of fraud were committed under such circumstances that he would not be presumed to have any knowledge of them,—as that they were done in secret, or were kept concealed; and he must also show the times and the circumstances under which the facts constituting the fraud were brought to his knowledge, so that the court may determine whether the discovery of these facts was within the time alleged, and, as the means of knowledge are equivalent to knowledge, if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry which, if followed, would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of these facts. These principles are so fully recognized that mere reference to some of the cases in which they have been enforced will be sufficient. (*Martin* v. *Smith*, 1 Dill. 85, Fed. Cas. No. 9,164; *Wood* v. *Carpenter*, 101 U. S. 135, 25 L. Ed. 807; *Hecht* v. *Slaney*, 72 Cal. 363, 14 Pac. 88; *Moore* v. *Boyd*, 74 Cal. 167, 15 Pac. 670; *Lataillade* v. *Orena*, 91 Cal. 565, 27 Pac. 924 [25 Am. St. Rep. 219].)"

In the case of *Ray* v. *Divers,* 81 Mont. 552, 264 Pac. 673, 675, this court reaffirmed its decision and reasoning in the case of *Kerrigan* v. *O'Meara,* supra, and held: "The plaintiff must show when the fraud or concealment was discovered, and the circumstances of the discovery must be shown, so the court may see whether by ordinary diligence it might not have been made before."

And in the case of *Lataillade* v. *Orena,* 91 Cal. 565, 25 Am. St. Rep. 219, 27 Pac. 924, 927, it was said: That the plaintiff "must show that he used due diligence to detect it [fraud], and, if he made any particular discovery, should state when it was made, what it was, how it was made, and why it was not made sooner; and, further, that one will be presumed to have known whatever with reasonable diligence he might have ascertained concerning the fraud of which he complains."

The undisputed evidence discloses that on August 14, 1919, plaintiff William D. Lasby knew from his own observation that the river had been cutting in on the southeast quarter of the northeast quarter of section 17, which lies directly north of lot 8, to the extent that part of the south line fence of the southeast quarter of the northeast quarter of section 17 had washed away. The first page of the abstract of title showed lot 8 of section 17 to contain 30.68 acres and showed the relation of the river to the lot—the north bank of the river being almost a quarter of a mile south of the south line of the southeast quarter of the southeast quarter of section 17. Shortly after the purchase of the land, the evidence discloses that he was investigating a method of breakwater or dams to prevent the river from further washing this part of the farm. Certainly, the plaintiff William D. Lasby then had knowledge of a material shortage in lot 8. At least he had sufficient knowledge to put a man of ordinary prudence on inquiry.

In September, 1919, he was advised by the witness Plunkett of the acreage in each field, and this was substantially as he now claims it to be. Again in either the spring of 1920 or 1922 he was advised by the witness Miller of the acreage in

two of the fields, which was less than claimed by Burgess. Lasby knew that both these witnesses were farmers, that they had farmed this particular land and were particularly familiar with it. Just why he should have disregarded the information these witnesses gave and suddenly relied on the information furnished by his hired man, Bradshaw, to the same effect is not explained. So far as the evidence discloses, there was no more reason for having a survey made upon Bradshaw telling him of the shortage than there was upon being told of it by Plunkett and Miller. He had the same information and the same means available in both instances.

Furthermore, the evidence discloses that plaintiff paid $400 ▉ of the interest on the purchase price mortgage October 15, 1923, then knowing of the alleged fraudulent acts of which he complains. One who pays the whole or a part of the consideration due from him, after a discovery of the facts or circumstances entitling him to rescind, will be held to have ratified the contract and waived his right to rescind. (*Guarantee Savings, Loan & Inv. Co.* v. *Moore,* 35 App. Div. 421, 54 N. Y. Supp. 787; *Foerster* v. *Squier,* 46 N. Y. St. Rep. 289, 19 N. Y. Supp. 367; *May* v. *Loomis,* 140 N. C. 350, 52 S. E. 728; *Mestler* v. *Jeffries,* 145 Mich. 598, 108 N. W. 994; *Dennis* v. *Jones,* 44 N. J. Eq. 513, 6 Am. St. Rep. 899, 14 Atl. 913.)

The plaintiffs bought the land with knowledge of the right ▉ of way of the Northern Pacific Railway Company. Knowing and seeing that the railroad ran across the land was sufficient to put an ordinary man on inquiry as to the extent of the right of way, where, as in this case, fraud is relied upon, and no representations were made as to the extent of the right of way. As to when and how the plaintiffs secured their knowledge of the extent of the railway right of way is neither alleged nor proved. Plaintiffs say their first knowledge of actual shortage was in November, 1923, and was derived from the survey made by the engineer and witness Helmick. They allege the width of the right of way in their complaint filed in January, 1924. The witness Helmick testified that in November, 1923, he surveyed only the outer

boundaries of the land and finished his survey as to other pieces in September, 1924. Plaintiffs' discovery and knowledge of the shortage on account of the right of way must have been derived from a source other than the survey, but as to how or when the record is silent.

The evidence discloses that the survey made by the engineer, Charles W. Helmick, was not tied to a government corner, but, instead, the northeast corner of the southwest quarter of section 16, as indicated by the fences then inclosing the land, was used as a starting point. Although he had the government field-notes which disclosed a government section corner stone and pits at the northeast corner of section 16, which was one-half mile east and one-half mile north of his starting point, he made no effort to locate it. Such a survey has but little probative value.

Under the law announced in the foregoing decisions, we conclude that the plaintiffs are not only estopped by their laches, but that their cause of action is barred by subdivision 4 of section 9033 of the Revised Codes of 1921.

The judgment is reversed and the cause remanded to the district court of Broadwater county, with direction to dismiss the action.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.

Rehearing denied July 16, 1930.